[No. 36151. *En Banc.* December 21, 1961.]

THE WASHINGTON STATE HIGHWAY COMMISSION *et al.,* *Appellants,* v. PACIFIC NORTHWEST BELL TELEPHONE COMPANY, *Respondent.*

THE WASHINGTON STATE HIGHWAY COMMISSION *et al.,* *Appellants,* v. PUGET SOUND POWER AND LIGHT COMPANY, *Respondent.*

THE WASHINGTON STATE HIGHWAY COMMISSION *et al.,* *Appellants,* v. KING COUNTY WATER DISTRICT No. 75, *Respondent.**

*Reported in 367 P. (2d) 605.

*The Attorney General, Delbert W. Johnson, Assistant,* and *Thomas R. Garlington, Special Assistant,* for appellants.

*Holman, Mickelwait, Marion, Black & Perkins, Cartano, Botzer & Chapman,* and *McMicken, Rupp & Schweppe,* for respondents.

*William E. Wall, amicus curiae.*

OTT, J.—Franchises to permit the construction of utility facilities on the right of way of secondary state highway No. 5-A were gratuitously granted by the Washington State Highway Commission to Pacific Telephone and Telegraph Company (now Pacific Northwest Bell Telephone Company), Puget Sound Power and Light Company, and King County Water District No. 75. The franchises provided, *inter alia,* that the donees would move their facilities at their expense "Whenever necessary for the construction, repair, improvement, alteration or relocation of" the highway.

Pursuant to the Federal-Aid Highway Act of 1956, as amended, primary state highway No. 1 has been designated as a part of the interstate highway defense system. The state highway commission, in compliance with federal and state policy, adopted resolution No. 896, which provides in part:

"Public and private utility facilities shall not be permitted to occupy the right of way of the national system of interstate and defense highways within this state except as authorized by this resolution."

The plan for construction of the interstate highway requires the removal of the utility facilities where the interstate highway intersects secondary state highway No. 5-A at Midway. March 7, 1960, the Director of Highways requested the three donees to remove and relocate their facilities.

Laws of 1959, chapter 330, § 2, p. 1629, RCW 47.44.030, provides in part:

" . . . *Provided,* That notwithstanding any contrary provision of law or of any existing or future franchise held by a public utility, the state highway commission shall pay or reimburse the owner for relocation or removal of any publicly, privately or cooperatively owned public utility facilities when necessitated by the construction, reconstruction, relocation or improvement of a highway which is part of the national system of interstate and defense highways for each item of cost for which the state shall be entitled to be reimbursed by the United States in an amount equal to at least ninety percent thereof under the provisions of section 123, Federal Aid Highway Act of 1958, and any other subsequent act of congress under which the state shall be entitled to be reimbursed by the United States in an amount equal to at least ninety percent of the cost of relocation of utility facilities on said national system of interstate and defense highways."

A dispute arose between the donees and the state highway commission as to who should pay the $73,341.72 relocation cost.

The state highway commission and the Director of Highways instituted a declaratory judgment action in King County against each of the donees, contending that chapter 330, Laws of 1959, was unconstitutional, and that the removal and relocation expense should be paid by the donees. The actions were consolidated and tried upon an agreed statement of facts substantially as above set forth.

From the judgments declaring the act to be constitutional, and decreeing that the utility facilities be removed and relocated at state expense, the Washington State Highway Commission and the Director of Highways have appealed.

Appellants contend that payment of the removal and relocation cost from the motor vehicle fund is not an expenditure "exclusively for highway purposes," and, hence, is violative of amendment 18 of the state constitution which provides:

"All fees collected by the State of Washington as license fees for motor vehicles and all excise taxes collected by the State of Washington on the sale, distribution or use of motor

vehicle fuel and all other state revenue intended to be used for highway purposes, shall be paid into the state treasury and placed in a special fund to be used exclusively for highway purposes. Such highway purposes shall be construed to include the following:

"(a) The necessary operating, engineering and legal expenses connected with the administration of public highways, county roads and city streets;

"(b) The construction, reconstruction, maintenance, repair, and betterment of public highways, county roads, bridges and city streets; including the cost and expense of (1) acquisition of rights-of-way, (2) installing, maintaining and operating traffic signs and signal lights, (3) policing by the state of public highways, (4) operation of movable span bridges, (5) operation of ferries which are a part of any public highway, county road, or city street;

"(c) The payment or refunding of any obligation of the State of Washington, or any political subdivision thereof, for which any of the revenues described in section 1 may have been legally pledged prior to the effective date of this act;

"(d) Refunds authorized by law for taxes paid on motor vehicle fuels;

"(e) The cost of collection of any revenues described in this section:

"*Provided*, That this section shall not be construed to include revenue from general or special taxes or excises not levied primarily for highway purposes, or apply to vehicle operator's license fees or any excise tax imposed on motor vehicles or the use thereof in lieu of a property tax thereon, or fees for certificates of ownership of motor vehicles."

■ We are here concerned with the meaning and scope of the phrase, "exclusively for highway purposes." Rules of construction require that words in the constitution be given their usual, ordinary, and nontechnical meaning. *Automobile Club of Washington v. Seattle*, 55 Wn. (2d) 161, 167, 346 P. (2d) 695 (1959); *Parkhurst v. Everett*, 51 Wn. (2d) 292, 294, 318 P. (2d) 327 (1957), and cases cited.

The word "exclusive," according to Webster's New International Dictionary (2d ed.), means:

"1. Excluding or having power to exclude, . . . de-

bar from possession, participation, or use, etc.; . . . limiting or limited to possession, control, or use . . .

"4. Single; sole; . . . also, singly devoted; . . ."

Since the adoption of the Eighteenth Amendment, this court has on two occasions construed the meaning and scope of the words, "exclusively for highway purposes."

In *State ex rel. Bugge v. Martin*, 38 Wn. (2d) 834, 232 P. (2d) 833 (1951), the court held that the motor vehicle fund could be used to retire the bonds of the Agate Pass bridge, stating [p. 840]:

". . . Inasmuch as the Agate pass bridge is being acquired to become a part of the state highway system, and money from the motor vehicle fund has been invested in bonds issued to provide funds for the construction of the bridge, bonds issued pursuant to the act are for highway purposes, and their issuance and sale does not offend amendment 18."

In *Automobile Club of Washington v. Seattle, supra*, the question was: Does the phrase "exclusively for highway purposes" permit the use of the motor vehicle fund to satisfy a tort judgment arising from negligent operation of a movable span bridge on a city street, which was part of the state highway system? In the cited case, we held that the payment of a tort judgment was not a highway purpose and stated [pp. 167, 168]:

". . . we are here confronted with a constitutional limitation adopted by the people, which is to be understood as their words used in their ordinary meaning and not in any technical sense. . . .

". . . we think it was the intention of the people to limit expenditures from the motor vehicle fund to those things which would directly or indirectly benefit the highway system. Clearly, the payment of a tort judgment does not fall within this category. Such an expenditure could in no way contribute toward the safety, administration, or operation of our highway system, but, rather, would establish a precedent that could result in substantially decreasing those funds reserved for such purposes. This, we feel, would be a detriment rather than a benefit to our highway system."

Measured by the above test and the definition of "exclusive," we hold that payment of the cost of relocation

of the utility facilities cannot be made from the motor vehicle fund. Such an expenditure would not be "exclusively for highway purposes."

The respondents could choose not to salvage the facilities currently on the interstate highway right of way, and elect to abandon the facilities at the location in question. Removal cost of the abandoned facilities (exclusive of relocation) could conceivably be an expense incident to the proper construction of the highway, to the same extent as would be the cost of removal of a tree or a hill. Whether the state could collect its cost for such removal from the owner of the facility is not within the pleadings or admitted facts, and we do not reach that issue.

Respondents contend that, by the passage of chapter 330, Laws of 1959, the legislature has defined the meaning and scope of "exclusively for highway purposes" to include the cost of relocation of the facilities, and that there is a presumption this legislative enactment is constitutional.

██ The constitution does not grant to the legislature the power or authority to define, by legislative enactment, the meaning and scope of a constitutional provision. Nor does the Eighteenth Amendment, which refers directly to this subject, grant such authority to the legislature. The clause, "Such highway purposes shall be construed to include the following," is language requiring judicial construction as to its meaning and scope. *Automobile Club of Washington v. Seattle, supra.* The construction of the meaning and scope of a constitutional provision is exclusively a judicial function. Art. 4, § 1, of the constitution, provides that "The judicial power of the state shall be vested in a supreme court, superior courts, justices of the peace, and such inferior courts as the legislature may provide."

█ The legislature has no constitutional power to define the meaning and scope of a constitutional provision. The presumption that a legislative enactment is constitutional is overcome, where, as here, there is no constitutional provision to support it.

Respondents next contend that payment of the cost of relocation of facilities by the state from funds other than

the motor vehicle fund is constitutional because (a) the act constitutes "a reasonable exercise of the police power," and (b) "prescribes in advance the terms upon which the Legislature will engage in a program of public improvements."

■ What is within the purview of a proper exercise of police power was defined in *Shea v. Olson*, 185 Wash. 143, 53 P. (2d) 615, 111 A. L. R. 998 (1936), as follows [p. 153]:

"However difficult it may be to give a precise or satisfactory definition of 'police power,' there is no doubt that the state, in the exercise of such power, may prescribe laws tending to promote the health, peace, morals, education, good order and welfare of the people. Police power is an attribute of sovereignty, an essential element of the power to govern, and a function that cannot be surrendered. It exists without express declaration, and the only limitation upon it is that it must reasonably tend to correct some evil or promote some interest of the state, and *not violate any direct or positive mandate of the constitution.* [Citing cases.]" (Italics ours.)

Accord, *Ragan v. Seattle*, 58 Wn. (2d) 779, 364 P. (2d) 916 (1961), and cases cited.

We are not here concerned with respondents' contentions (a) and (b), if chapter 330, Laws of 1959, is repugnant to "any direct or positive mandate of the constitution." We have herein decided that the expenditure, if paid from the *motor vehicle fund*, is repugnant to amendment 18 of the constitution. Would payment from the state's general fund be repugnant to the constitution?

Art. 8, § 5, of the state constitution, provides:

"The credit of the state shall not, in any manner be given or loaned to, or in aid of, any individual, association, company or corporation."

■ Does the prohibition against giving or loaning the credit of the state to any individual, association, company or corporation encompass a gift or grant thereto? In *State v. Guaranty Trust Co. of Yakima*, 20 Wn. (2d) 588, 148 P. (2d) 323 (1944), a grant of state funds to persons not in need was declared to be a gift of the credit of the state and repugnant to the above-quoted section of the constitution.

Legislative acts giving public funds or credit of the state to individuals, associations, companies or corporations are clearly within the prohibition of the constitution.

█  In the instant case, all of the attributes of a gift are present. The general fund of the state would be decreased by the gift, and the recipients thereby gratuitously benefited.

We conclude that payment by the state of the cost of relocating the utility facilities is not a proper exercise of the police power, in that it violates the direct and positive mandates of amendment 18 and Art. 8, § 5, of the state constitution.

Finally, respondents contend that, assuming that the payment did constitute a gift, such a gift by the legislature is within the purview of the constitution for the reason that the expenditure is in furtherance of a *public purpose.*

█  The utility companies here in question perform a public service, and are subject to state regulation. The performance of such service does not constitute a state purpose for the reason that the facilities are owned and operated by entities other than the sovereign state of Washington. *State Highway Comm. v. Southern Union Gas Co.,* 65 N. M. 84, 332 P. (2d) 1007, 75 A. L. R. (2d) 408 (1958); *Cincinnati v. Harth,* 101 Ohio St. 344, 128 N. E. 263, 13 A. L. R. 308 (1920). The general fund of the state cannot be constitutionally appropriated by the legislature to pay the operating cost of a separate entity, simply because it is engaged in performing a public service. Art. 8, § 5, of the constitution, prohibits the legislature from appropriating public funds to pay the respondents' expenditures here in question.

We have carefully considered the cases cited from other jurisdictions which, for various reasons, have adopted a contrary view. The cited provisions of the constitution of this state require the construction herein expressed. The following jurisdictions, having similar constitutional provisions, are in harmony with our interpretation: *State ex rel. Rich v. Idaho Power Co.,* 81 Idaho 487, 346 P. (2d) 596 (1959); *State v. Southern Bell Tel. & Tel. Co.,* 204 Tenn. 207, 319 S. W. (2d) 90 (1958); *Mulkey v. Quillian,* 213 Ga.

507, 100 S. E. (2d) 268 (1957); *Opinion of the Justices*, 152 Me. 449, 132 A. (2d) 440 (1957); *Southern Bell Tel. & Tel. Co. v. Commonwealth* (Ky.) 266 S. W. (2d) 308 (1954). ■■■ For the reasons stated, we hold that chapter 330, Laws of 1959, is unconstitutional.

The judgments are reversed, and the causes remanded with instructions to enter judgments in accordance with the views herein expressed.

MALLERY, HILL, DONWORTH, WEAVER, ROSELLINI, and FOSTER, JJ., concur.

HUNTER, J. (dissenting)—I dissent. Because I would affirm the judgment of the trial court, I find it necessary to discuss all the contentions raised on this appeal. First, in the interest of clarity, a short comment is required with regard to the background of the case.

A greatly expanded national highway program was embarked upon when Congress enacted the Federal-Aid Highway Act in 1956 (amended in 1958). Due to the modern construction concept of nonaccess and limited-access freeways, private and public utility companies are being, and will be, required to remove completely their facilities which obstruct construction of the new highway areas. In many cases, such removal necessitates great expense.

Traditionally, private and public utility companies have been allowed the free use of state highways for installation of facilities. Congress evidenced its concern with the effect that the new highway program would have upon utilities by the passage of § 3 of the act, 23 U.S.C.A. § 123, which provides:

"When a State shall pay for the cost of relocation of utility facilities necessitated by the construction of a project on the Federal-aid primary or secondary systems or on the Interstate System, including extensions thereof within urban areas, Federal funds may be used to reimburse the State for such cost in the same proportion as Federal funds are expended on the project. Federal funds shall not be used to reimburse the State under this section when the payment to the utility violates the law of the State or violates a legal contract between the utility and the State. . . ."

In order to supplement the federal enactment, the legislature of this state passed Laws of 1959, chapter 330, amending the statute relating to franchises on state highways. RCW 47.44.030 now reads as follows:

"Removal of facilities—Notice—Reimbursement of owner when national system involved. If the director deems it necessary that such a facility be removed from the highway for the safety of persons traveling thereon or for construction, alteration, improvement, or maintenance purposes, he shall give notice to the franchise holder to remove the facility at his expense and as the director orders: *Provided, That notwithstanding any contrary provision of law or of any existing or future franchise held by a public utility, the state highway commission shall pay or reimburse the owner for relocation or removal of any publicly, privately or co-operatively owned public utility facilities when necessitated by the construction, reconstruction, relocation or improvement of a highway which is part of the national system of interstate and defense highways for each item of cost for which the state shall be entitled to be reimbursed by the United States in an amount equal to at least ninety percent thereof under the provisions of section 123, Federal Aid Highway Act of 1958, and any other subsequent act of congress under which the state shall be entitled to be reimbursed by the United States in an amount equal to at least ninety percent of the cost of relocation of utility facilities on said national system of interstate and defense highways.*" (Italics mine.)

The respondent utility companies, hereafter referred to as the defendants, applied to the state for reimbursement of relocation costs, pursuant to the above-amended statute. The appellant State Highway Commission, hereafter referred to as the plaintiff, brought the declaratory judgment action below to have the statute declared unconstitutional. The trial court held the statute to be constitutional and entered judgment for the defendants. This appeal followed.

The plaintiff contends that the statute is in contravention of Art. 8, § 5 of the Constitution of the State of Washington, which provides:

"The credit of the state shall not, in any manner be given or loaned to, or in aid of, any individual, association, company or corporation."

The manifest purpose for the inclusion of this provision in our constitution is to prevent state funds from being used to benefit private interests where the public interest primarily is not served. The rationale of all the cases in which this prohibition has been invoked is that if the expenditure is made, or to be made, for a *public purpose*, it is not a donation or gift which violates the constitution.

In *State ex rel. Tattersall v. Yelle*, 52 Wn. (2d) 856, 329 P. (2d) 841 (1958), we gave the following answer to an argument based upon the prohibition of Art. 8, § 5:

" . . . In return for this state's share of the operating costs of the interstate commission, it receives benefits in educational facilities for the residents of this state. *The legislature, in the proper exercise of its discretion, has deemed the benefits received to be a sufficient consideration for the funds expended. The expenditure of funds for such purpose does not constitute the giving or loaning of the credit of this state.* [Cases omitted.]" (Italics mine.)

Hence, if the legislature has acted pursuant to its police power to serve a public interest or meet a public need, expenditure of state funds to private persons is not a violation of the constitution. The public benefit achieved is the "consideration" for the funds expended.

The plaintiff has cited *Morgan v. Department of Social Security*, 14 Wn. (2d) 156, 127 P. (2d) 686 (1942) and *State v. Guaranty Trust Co.*, 20 Wn. (2d) 588, 148 P. (2d) 323 (1944), for the proposition that Art. 8, § 5 permits only needy persons to be recipients of state funds. The cases cannot be construed so narrowly. We were dealing with public assistance statutes and in that context we intimated that if public assistance was to be given to persons not in need, the act might well have been unconstitutional. The obvious reason was that public aid to persons not in need would not have served a public interest and, therefore, would have involved expenditure of state funds for purely private purposes.

The precise question raised by this contention is whether the reimbursement funds are to be expended for a public purpose.

For over fifty years, this state has allowed utility companies the free use of state highways for locating facilities when that use does not conflict with the primary object of travel. *State ex rel. York v. Board of Cy. Com'rs of Walla Walla Cy.*, 28 Wn. (2d) 891, 184 P. (2d) 577, 172 A. L. R. 1001 (1947). In 1937, the legislature prescribed statutory conditions under which utilities may be granted a franchise to use highways. RCW 47.44.020 provides:

"After the hearing, *if the director deems it to be for the public interest,* he may grant the franchise in whole or in part, under such regulations and conditions as he may prescribe, with or without compensation, but not in excess of the reasonable cost to the director for investigating, handling and granting the franchise. . . ." (Italics mine.)

The fact that utilities long have been allowed to use state highways at no expense clearly demonstrates that the public is vitally interested in the important function they perform in the economy of the state. If no public purpose was being served by the utilities' use of the highways, the franchises granted by the state would be in violation of Art. 1, § 12 of the Washington Constitution which prohibits the state from granting special privileges and immunities to individuals or corporations. Yet, the constitutional authority of this state to permit free use of the highways to utilities has never been questioned. *State ex rel. York v. Board of Cy. Com'rs of Walla Walla Cy., supra.*

Another obvious demonstration of the public's concern with utility companies and the service they perform is shown by the great extent to which they are regulated by statute in many aspects. Title 80, RCW.

Keeping in mind, then, that utility companies are greatly affected with a public interest, the question is raised: What specific public interest is served by the enactment allowing reimbursement for relocation of facilities? In answering this question, our function is only to determine "If a state of facts which would justify the legislation can reasonably be conceived to exist. . . ." *Shea v. Olson,* 185 Wash. 143, 53 P. (2d) 615, 111 A. L. R. 998 (1936).

Initially, it is to be noticed that the same public interest which supports the power of the state to allow utilities the free use of the highways certainly supports the power of the state to reimburse utilities for relocation costs. In both situations the state is "giving" to a certain class something in which others cannot participate; the justification is that the public, as a whole, is benefited through the availability of utility services. The reimbursement statute merely extends the state's "assistance" to utilities which began with the grant of the privilege to use highways at no cost.

The highest courts of several states have passed upon the constitutionality of substantially similar reimbursement statutes and they have found that the factual circumstances which relate to such an enactment clearly show that a public interest is served thereby. Although the particular statutes and constitutional provisions of those states are not word-for-word identical to Washington's statute and constitutional provisions, we may take note of what those courts held with regard to whether a reimbursement statute, such as we have here, can be said to be enacted in the public interest.

In *Minneapolis Gas Co. v. Zimmerman*, 253 Minn. 164, 91 N. W. (2d) 642 (1958), the court stated:

". . . We have already pointed out that the use of rights-of-way by utilities for locating their facilities is one of the primary purposes for which highways are designed, even though their principal use is for public travel and transportation of persons and property. It follows that where it becomes reasonably necessary to relocate such utility facilities in order to improve the highway for public travel . . . an expenditure of funds to effect such relocation is properly a governmental function exercised for a public purpose of primary benefit to the entire community. It is primarily for a public purpose not only because the relocation is made necessary in order to expedite public travel and transportation, but also for other substantial reasons. . . ."

In *State Highway Department v. Delaware Power & Light Co.* (Del.), 167 A. (2d) 27 (1961), the court stated that

". . . To depend upon many of the smaller communities and utilities to provide for the expense of this removal would in many instances not only bankrupt such communi-

ties, but, foreseeably, would cause considerable delay in the completion of the project. . . . "

The following language from *State ex rel. Albuquerque v. Lavender,* 365 P. (2d) 652 (N. M. 1961), also is pertinent:

"It is also obvious that unless relocation costs are paid out of the public highway fund, the utility users will ultimately pay more than their fair share of the costs of interstate and defense highways. The utility companies, if required to bear relocation costs, will simply raise their rates to cover such costs. The relatively small portion of the public affected by such raises will therefore be forced to bear highway costs which benefit the entire public and this after they have already paid a proportionate share of the total highway expenses. In exercising its police power, we think the state may legitimately and properly consider the effect, not only upon the entire public, but also upon particular segments thereof, and evolve a plan and scheme which will accomplish the greatest public good at the least expense to those adversely affected. When we speak of forcing the utility companies to bear relocation costs, we are overlooking the practical fact that such costs will be passed on to the utility consuming public. Thus, we see in the statute under consideration a legitimate and equitable apportionment of costs of relocations rather than a donation to utility companies."

The reasoning in these cases seems equally applicable to the instant case. The legislature of the state of Washington reasonably could have conceived of similar states of facts which justify the enactment of a reimbursement statute as an exercise of the police power.

Furthermore, in view of the enactment by many other states of reimbursement statutes and those states' acceptance of federal matching funds, the legislature of this state may have had in mind a very realistic approach to serving a public interest when it enacted a similar statute. It is apparent that Washington residents will be at a disadvantage if utility companies are not allowed reimbursement for relocation costs. Along with utility rate increases for the many Washington customers of companies affected, the federal taxes paid by the people of Washington will benefit the people of those states which have reimbursement statutes

and accept federal funds; without a statute in this state, there will be no corresponding benefit to our people through the availability of federal matching funds, which by the statute in question would cover 90 per cent of total reimbursement costs. Certainly, the passage of the statute for this purpose can be said to be in the public interest.

Other cases in which reimbursement statutes have been held to be enacted for a public purpose are *State v. City of Austin*, 160 Tex. 348, 331 S. W. (2d) 737 (1960); *State Road Comm. v. Utah Power & Light Co.*, 10 Utah (2d) 333, 353 P. (2d) 171 (1960); *Oswego & S. R. Co. v. State*, 226 N. Y. 351, 124 N. E. 8 (1919); *Opinion of Justices*, 101 N. H. 527, 132 A. (2d) 613 (1957); *Department of Highways v. Pennsylvania Public Util. Comm.*, 185 Pa. Super. 1, 136 A. (2d) 473 (1957); *Northwestern Bell Tel. Co. v. Wentz* (N. D.), 103 N. W. (2d) 245 (1960); *Jones v. Burns* (Mont.), 357 P. (2d) 22 (1960); *Wilson v. Long Branch*, 27 N. J. 360, 142 A. (2d) 837 (1958). By a proper exercise of judicial review, the courts in these states have reached the inescapable conclusion that there are both practical and equitable public purposes for which a reimbursement statute was enacted.

The plaintiff has argued that this court has never recognized equitable considerations as a justification for a legislative enactment. Our case law reflects the contrary. In *State ex rel. Hart v. Clausen*, 113 Wash. 570, 194 Pac. 793, 13 A. L. R. 580 (1921), we stated:

" . . . If the purpose for which the taxing power is exercised is a public purpose, a moral obligation on the part of the state to meet that purpose is sufficient to sustain the law. In other words, if there is a moral and honorable claim upon the public treasury, although there be no debt which could obtain recognition in a court of law or equity, a basis for the exercise of the taxing power is furnished. [Cases omitted.]"

In the instant situation, it is very conceivable that the legislature deemed it unfair that the utilities, and ultimately, their customers, should bear the entire cost of relocation when it is occasioned by the state and federal highway program which is to benefit all the people of the state. The

legislature, as a matter of justice, might have determined to equalize the burden among those who actually benefit by the highway program. It appears clear that the establishment of some parity between benefits and burdens in relation to a public endeavor such as highway construction is in the public interest.

In support of its argument that the reimbursement statute serves no public purpose, the plaintiff has cited cases from Idaho and Tennessee, which admittedly represent the minority position in this respect. In *State v. Southern Bell Tel. & Tel. Co.*, 204 Tenn. 207, 319 S. W. (2d) 90 (1958), the court said that a public purpose is shown only if the state has the right of use of the property upon which the fund is expended. We have never limited the concept of public purpose so narrowly and, in order to do so, we would have to substitute our opinion, as to the wisdom of the act, for that of the legislature's. In *State ex rel. Rich v. Idaho Power Co.*, 81 Ida. 487, 346 P. (2d) 596 (1959), the issue of public purpose was entirely confused by the reasoning that reimbursement payments to utility companies, in effect, would grant them a vested property right in public ways when the constitution allows the legislature to grant a permissive use only. Clearly, such reasoning is foreign to the issue of whether the legislature may validly exercise its police power in assisting utilities greatly affected with a public interest.

The same reasons why the statute does not violate Art. 8, § 5 of the state constitution also dispose of the plaintiff's contention that the statute contravenes amendment 14 to the Washington State Constitution which provides that taxes " . . . shall be levied and collected for public purposes only. . . ."

The plaintiff also predicates the statute's unconstitutionality upon the prohibition set forth in Art. 2, § 28 (10), of the state constitution, which precludes the legislature from enacting any private or special laws which result in:

"Releasing or extinguishing in whole or in part, the indebtedness, liability or other obligation, of any person, or corporation to this state, or to any municipal corporation therein."

In *State ex rel. Collier v. Yelle,* 9 Wn. (2d) 317, 115 P. (2d) 373 (1943), we analyzed the prohibition thusly:

"It was obviously the intent of this subsection to prohibit the legislature from, by special laws, favoring any debtor or group of debtors obligated to the state or any municipal subdivision thereof. . . . It is one of eighteen constitutional prohibitions against special legislation, all of which tend to protect the people of the state as a whole from legislative favoritism of an individual or a group."

The answer to the plaintiff's argument is that when the legislature passed the reimbursement statute here involved, there was no accrued debt or obligation owing to the state from the defendants. Prior to the enactment, no demand had been made to relocate facilities at their own expense, pursuant to the original franchise granting free use for facility installations. All that the legislature did was to pass a general statute, prospective in application, which changed an existing law. The unsoundness of the plaintiff's argument was well illustrated in *State Road Comm. v. Utah Power & Light Co., supra,* where the court said:

"Article 6, Section 27, prohibits the legislature from releasing or extinguishing, in whole or in part, the indebtedness, liability or obligation of any corporation or person to the state, or to any municipal corporation. The claim that the Utility Relocation Act of 1957 offends this provision by changing the common law rule and requiring the state to pay the non-betterment costs of the relocation of the utility facilities is to argue that all laws which will cause obligations to arise in favor of the state upon the happening of future events are forever frozen as far as the legislature is concerned. This notion would mean that the legislature could enact a law imposing liability in favor of the state for prospective conduct and retain no power of repeal. We are persuaded that this section carries no such implications and does not invalidate legislation concerning transactions or acts yet future."

The plaintiff next contends that the law violates the eighteenth amendment to our state constitution which prohibits use of highway funds for other than highway purposes. This contention rests upon the false assumption that

reimbursements under the statute must be paid out of highway funds.

The statute *does not* specify the source or fund to be used to meet the state's share of total reimbursements. It only provides that the ". . . state highway commission shall pay or reimburse the owner. . . ." As no specific fund was designated as the source for reimbursements, it is conceivable for payments to be made from a source other than the state highway fund, namely, the General Fund of the state. The Highway Commission is empowered by RCW 43.27.200 to present to the legislature the budget for the next biennium and the general appropriation statute may include funds necessary to pay or reimburse utilities for relocation costs. The federal matching funds coming to the state will be paid into the contingent receipts fund pursuant to RCW 43.79.250 and the Director of the State Highway Commission may make application for necessary funds which the Governor may expend by his written authorization. RCW 43.79.260 and RCW 43.79.270.

It appears from the record that prior to the trial the plaintiff entered into agreements with each defendant separately wherein it was provided that the state of Washington shall pay the defendants actual and related, indirect, net replacement costs of relocating the facilities; but it was provided further that:

"For the purposes of this Agreement the constitutionality of Chapter 330, Laws of 1959, pursuant to which the State acknowledges its responsibility and promises to pay the cost of relocation and removal of the utility facilities in accordance with this Agreement, is assumed. However, a case to test the constitutionality of that act has been, or is about to be, instituted. It is, therefore, expressly agreed that, if said act shall be declared unconstitutional or otherwise void by the Superior Court, if not appealed, or by the Supreme Court of the State of Washington upon appeal, the utility agrees, upon demand, to reimburse the State and repay fully those amounts, if any, received by the utility from the State pursuant to the operation of that act."

The plaintiff argues that since the only funds available to it in either the 1959-1961 or 1961-1963 bienniums are those

appropriated for highway purposes from the Motor Vehicle Fund, it must be concluded that the legislature intended that fund to be used for reimbursements under chapter 330.

In answer to this argument, it is sufficient to say that, in bringing this action, the plaintiff raised, as the sole issue, the constitutionality of the reimbursements statute. As shown previously, the statute on its face does not violate the Eighteenth Amendment because it is not worded so as to preclude the use of monies from the General Fund of the state treasury. In this regard, it is significant to note that in all the cases in which the other state courts answered the contention based upon a constitutional restriction on use of highway funds, the particular statute involved contained language to the effect that highway funds were to be used in making reimbursements. As stated previously, no such language appears in the statute before this court.

Since no party in this action seeks to restrain the plaintiff from performing the above contracts and no party has questioned the legality of those contracts, the plaintiff has not properly presented this court with the question of whether its action in agreeing to use highway funds itself is constitutional. We should not pass upon that question at this time, for to do so would be to render an advisory opinion.

Manifestly, the legislation in question, whether it should be characterized as a highway regulation, or otherwise, is an exercise of the police power of the state. In *Shea v. Olson*, 185 Wash. 143, 53 P. (2d) 615 (1936), we discussed, at length, the fundamental nature of the police power and the scope of judicial review with respect to its exercise:

". . . there is no doubt that the state, in the exercise of such power, may prescribe laws tending to promote the health, peace, morals, education, good order and welfare of the people. Police power is an attribute of sovereignty, an essential element of the power to govern, and a function that cannot be surrendered. It exists without express declaration, and the only limitation upon it is that *it must reasonably tend to correct some evil or promote some interest of the state, and not violate any direct or positive mandate of the constitution.* . . .

"While, formerly, the power was viewed as one of strict

and direct application, it has now come to be more favored on account of changed and changing economic and social conditions, and at present is frequently relied on to sustain laws which affect the common good in only an indirect way. . . . A large discretion is therefore vested in the legislature to determine what the public interest demands and what measures are necessary to secure and protect the same. . . .

"In determining whether a law comes within the police power of the state, it is not incumbent upon the court to find that facts which would justify such legislation actually exist. *If a state of facts which would justify the legislation can reasonably be conceived to exist, the court must presume that it did exist and that the law was passed for that purpose.*" (Italics mine.)

As it justifiably can be said that the reimbursement statute does promote the public interest and as it does "not violate any direct or positive mandate of the constitution" it should be upheld as a valid exercise of the state's police power.

The judgment of the trial court should be affirmed.

FINLEY, C. J., concurs with HUNTER, J.

***

April 10, 1962. Petition for rehearing denied.